**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| AURORA CARILLO, on behalf of her /minor children J.G., N.G., and Y.G., and on behalf of all others similarly situated, | No. _____ |
| Plaintiffs. | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| CLEO COMMUNICATIONS, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ........................................................................................................... 4

      A.    Plaintiff ................................................................................................ 4

      B.    Defendant ............................................................................................. 5

III.  JURISDICTION AND VENUE ........................................................................ 5

IV.  FACTUAL ALLEGATIONS ............................................................................ 6

      A.    Cleo's Business Focuses on the Purportedly Secure Transfer of Highly Sensitive Information................................................................ 6

      B.    The Data Breach ................................................................................ 13

      C.    The Data Breach Was Foreseeable ................................................... 16

      D.    The Value of Plaintiff's PII................................................................ 18

      E.    Defendant Failed to Properly Protect Plaintiff's and Class Members' Private Information................................................................ 19

      F.    Defendant Failed to Comply with FTC Guidelines ............................. 24

      G.    Defendant Failed to Comply With Industry Standards for Data Security ............................................................................................. 25

      H.    The Effects of the Data Breach.......................................................... 28

V.    CLASS ACTION ALLEGATIONS ................................................................ 31

VI.  CLAIMS FOR RELIEF ................................................................................. 36

COUNT 1 NEGLIGENCE ...................................................................................... 36

COUNT 2 NEGLIGENCE PER SE ........................................................................ 40

COUNT 3 UNJUST ENRICHMENT....................................................................... 41

COUNT 4 DECLARATORY JUDGMENT ............................................................. 44

REQUEST FOR RELIEF ........................................................................................ 47

- i -

DEMAND FOR JURY TRIAL ................................................................................................... 48

Plaintiff, Aurora Carrillo, on behalf of her minor children J.G., N.G., and Y.G., ("Plaintiff") and on behalf of all others similarly situated (collectively, "Class Members"), brings this class action against Cleo Communications, Inc., ("Defendant"), and alleges upon personal knowledge as to Plaintiff's own actions and Plaintiff's counsel's investigations, and upon information and belief as to all other matters as follows:

## I.    INTRODUCTION

1.    Plaintiff brings this Class Action Complaint against Defendant Cleo Communications for its failure to properly secure and safeguard highly sensitive personally identifiable information ("PII") of her minor children—including, but not limited to, her children's full names, dates of birth, gender, and student ID number—and protected health information such as Medicaid ID numbers, ("PHI," and together with PII, "Private Information") accessed, compromised, and obtained by malicious, unauthorized third parties from Defendant's systems as early as December 2024 (the "Data Breach").

2.    Defendant Cleo Communications is an Illinois based software company that offers a wide range of software products and services to over 4,000 customers worldwide, including purportedly secure managed file-transfer (MFT) platforms Cleo markets under the names Harmony, VLTrader, and LexiCom. These products are at the center of the Data Breach here.

3.    Cleo VLTrader targets mid-sized organizations while Cleo Harmony contains more comprehensive features and targets enterprise clients, and LexiCom works primarily as a desktop-based client for interacting with major trading networks.[1]

4.    Cleo is a vendor for Chicago Public Schools ("CPS").

---

[1] https://www.cybereason.com/blog/cve-2024-55956-cleo-vulnerability

5.    On or about March 10, 2025, CPS announced an unauthorized third party gained access to Cleo's network systems and obtained filed containing PII, including the PII of current and former students, including Plaintiff's minor children and Class Members.

6.    During their business operations, Defendant acquired, collected, utilized, and derived benefit from Plaintiff's and Class Members' private information. Defendant owed and otherwise assumed statutory, regulatory, contractual, and common-law duties and obligations, including to keep Plaintiff's and Class Members' private information confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach.

7.    Despite its duties to Plaintiff and Class Members related to and arising from its secure file transfer services and applications, defendant maintained, and/or hosted Plaintiff's and Class Members Private Information on its transfer services software that was negligently and/or recklessly configured and maintained so as to contain security vulnerabilities that resulted in multiple breaches of its network and systems or of its customers networks and systems, including Chicago Public Schools ("CPS"). These security vulnerabilities existed prior to the breach. As a result of the breach, unauthorized third-party cyber criminals gained access to and obtained Plaintiff's and Class Members' PII.

8.    Upon information and belief, Defendant maintained the private information of thousands of individuals in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that utilized Cleo's file transfer software which contained security vulnerabilities. These security vulnerabilities led to dozens of cyberattacks, including the cyberattack of CPS that resulted in the theft of Plaintiff's PII.

9. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant because other file transfer programs had previously been subjected to criminal hacking. Thus Defendant was on notice of that fact and to take appropriate design and protective measures that would not expose and increase the risk that the Private Information could be compromised and stolen.

10. The cyberattack at issue was carried out by the well-known Russian cyber gang Cl0p, which had previously carried out multiple, highly-publicized attacks on file transfer software providers and users.

11. Hackers such as Cl0p can and do offer for sale unencrypted, unredacted private information to criminals. The exposed private information of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

12. Plaintiff and Class Members now face a current and ongoing risk of identity theft, which is heightened by the loss of Medicaid ID numbers of children.

13. Upon information and belief, this Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members.

14. When Cleo's customers use Cleo's file transfer software, they entrust Cleo with confidential files and data, including Plaintiff's and Class Members' Private Information, and Cleo accepts responsibility for securely managing and protecting such Private Information.

15. While many details of the data breach remain in the exclusive control of Defendant, upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (i) failing to design, implement, monitor, and maintain a reasonable

software and/or network safeguards against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to warn Plaintiff and Class Members of Defendant inadequate data security practices; (v) failing to encrypt or adequately encrypt the private information; and (vi) otherwise failing to secure the software and hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

16.     As a result of Defendant's unreasonable and inadequate data security practices that resulted in the data breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including (i) invasion of privacy; (ii) financial, out-of-pocket costs incurred mitigating the materialize risk and imminent threat of identity theft; (iii) loss of time and productivity incurred mitigating the materialize risk and imminent threat of identity theft risk; (iv) financial, out-of-pocket costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) anxiety, annoyance, and nuisance; and (viii) the continued risk to their private information, which remains in control of Defendant, which is subject to further breaches, as long as Defendant fails to undertake appropriate and adequate steps to protect Plaintiff's and Class Members' private information.

17.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct and asserting claims for negligence, negligence per se, unjust enrichment and declaratory judgment.

## II.     PARTIES

### A.     Plaintiff

18.     Plaintiff is a citizen of Illinois.

19.     Plaintiff's minor children J.G., N.G., and Y.G. are students at CPS.

20.     CPS collected, stored, and transferred J.G., N.G., and Y.G.'s PII using Cleo's software.

21.     Cleo stored and maintained J.G., N.G., and Y.G.'s PII on its network systems, including the systems impacted by the Data Breach.

22.     Plaintiff received a notice letter from CPS dated March 10, 2025 regarding the files accessed in the Data Breach which included J.G., N.G., and Y.G.'s PII. A true and correct copy of the notice is attached here as Exhibit A.

23.     After learning of the Data Breach, Plaintiff spent time and effort researching the Data Breach and monitoring her accounts for fraud to mitigate harm to herself and her family including, J.G., N.G., and Y.G.

24.     As a direct result of the Data Breach, J.G., N.G., and Y.G. have suffered injury and damages including but not limited to: a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of PII; and deprivation of the value of their PII.

**B.      Defendant**

25.     Cleo Communications, Inc. is an Illinois corporation that maintains its principal place of business at 4949 Harrison Avenue, Suite 200, Rockford, Illinois 61108.

26.     Cleo Communications US, LLC is a Delaware corporation that maintains its principal place of business at 4949 Harrison Avenue, Suite 200, Rockford, Illinois 61108.

### III.      JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Defendant is a citizen of a State different from that of at least one Class member.

28.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

29.     In accordance with 28 U.S.C. § 1391, venue is proper in the Northern District of Illinois because Defendant Cleo Communications is a resident of this judicial district, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and because the Northern District of Illinois is a judicial district in which Defendant Cleo Communications is subject to the Court's personal jurisdiction with respect to this action.

## IV.    FACTUAL ALLEGATIONS

### A.    Cleo's Business Focuses on the Purportedly Secure Transfer of Highly Sensitive Information

30.     Based in Rockford, Illinois, with offices in Chicago, Bangalore, and London, Cleo develops, manages, creates, services and supports managed file transfer ("MFT") solutions specifically designed to enable its customers to move sensitive data without the need for programming or special skills.[2]

31.     Cleo's corporate customers utilize managed file transfer solutions because they need a secure method for transferring data since they deal with sensitive information.[3]

32.     Cleo knows and intends that its customers use its file transfer software to transfer highly sensitive personally identifiable information, among other information.

33.     And as a condition of receiving secure file transfer services, Cleo requires that its customers entrust it and its file transfer software programs with highly sensitive Private Information belonging to Plaintiff and Class Members.

---

[2] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

[3] https://resources.cleo.com/mft-guide?_gl=1*gm0084*_gcl_au*MTkwNjE4NTc4NC4xNzQ0ODIxNjIw*_ga*MTU2NDAxMTcwOS4xNzQ0ODIxNjIw*_ga_W5D3WH12BR*MTc0NDk4NTk4Ni41LjEuMTc0NDk4OTMwNC41Ny4wLjExNjA2NDEyNTQ.#page=1

34.     Prior to managed file transfer, file transfer protocol ("FTP") was the leading method of efficiently transferring documents. But because file transfer protocol does not possess high-level security measures, MFT was created as a purportedly more secure alternative.[4]

35.     MFT software is designed to connect companies' information sources and their consumers. Thus, after building a digital connection between two entities, they expect to be able to securely and confidently move data between each other. Companies commonly connect with partners, suppliers, and customers.[5]

36.     At all times relevant, and continuing through the present, Cleo markets, advertises, and warrants its file transfer software as having industry leading data security that complies with applicable data security laws and will keep private information from being compromised.

37.     Cleo notes that the "[t]he main use case for MFT is for secure data movement between parties."[6] Thus, "Managed file transfer (MFT) is a secure solution that provides reliable inbound and outbound file transfer for organizations, whether within their private network or to external users. The 'managed' aspect of MFT refers to the ability of the solution to automate, simplify, and streamline data transfers across one or several organizations, within a private network, or with external users."[7] In addition, "Managed file transfer offers many features that ensure secure and reliable file transfers, including encryption, user authentication, and audit trails. These features are crucial for organizations that must comply with regulations like PCI DSS or HIPAA. MFT helps guarantee the security and integrity of sensitive data."[8]

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

[8] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

38.     Cleo describes that managed file transfer works via a multi-step process. First, "[t]he MFT file transfer application sends original files." Second, "[t]he files are encrypted by the MFT solution. Once the transfer has been established, the MFT solution receives the data and secures it in a number of ways. Most MFT employs one of many protocols to encrypt the transfer and AES ciphers that comply with FIPS 140-2 to encrypt the files. Some methods also permit file compression using zip." Third, "[t]he data delivery is received by the recipient. Once the MFT file transfer has left your server, it is transferred to the address you provided, such as an email address, a specific folder on another server, etc. At this point, the file can then be decrypted by the recipient." Finally, "many file transfer solutions can be helpful to set up bulk or repeating transfers using auto-resume to ensure files arrive at their destination without the need for troubleshooting, as well as creating logs to get an overlooking view of all file transfers (even weeks/months after they're finished)."[9]

39.     In advocating for the use of managed file transfer, Cleo publicly recognized that "[i]n the modern landscape, safeguarding sensitive data is crucial, both while it is in transit and while it is stored. One of the various file transfer choices is managed file transfer. But it stands out from other file transfer strategies as a centralized means for securely automating, encrypting, and transmitting data from one location to another."[10]

40.     Among the variety of benefits associated with Cleo's managed file transfer solutions, Cleo points to data security as a particularly important benefit, allowing users to

---

[9]   https://www.cleo.com/solutions/technology/mft-managed-file-transfer (How does managed file transfer work?)

[10]   https://www.cleo.com/solutions/technology/mft-managed-file-transfer (Why use managed file transfer?)

"[e]liminate security gaps and govern men's challenges with structured access control."[11] Indeed, Cleo represents that it uses a centralized, enterprise – level approach to automate, secure, and govern all managed file transfers moving throughout the business ecosystem," enabling "the data protection and data security large enterprises need for all system – based and ad hoc file transfers."[12]

41.    For instance, Cleo declares it "is committed to providing high-quality products and services" and that its "Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[13] It emphasizes that its "commitment to data privacy and security is embedded in every part of our business."[14] And it boasts "[w]e understand the importance of maintaining a secure environment for our users" such that "[b]y regularly conducting vulnerability scans and promptly addressing any identified issues, we strive to provide you with a robust and secure software experience."[15]

42.    Cleo further described its file transfer solutions as providing "extensive features and functionality to secure your file transfer environment," accompanied by a variety of purported security capabilities, including:

    a.    Multi-Level user access with support for LDAP/AD integration including SSO;

    b.    Perimeter layer security model;

    c.    Highly varied algorithm support for any platform compatibility;

---

[11]https://www.cleo.com/solutions/technology/mft-managed-file-transfer (What are the benefits of MFT solutions?)

[12] https://www.cleo.com/solutions/technology/mft-managed-file-transfer (Why do large enterprises tend to choose CIC MFT over other managed file transfer options?)

[13] https://www.cleo.com/company/about-cleo

[14] https://trustcenter.cleo.com/?_gl=1*19ux0ak*_gcl_au*MTkwNjE4NTc4NC4xNzQ0ODIxNjIw

[15] *Id.*

d.      Connection pool-based system with support for forward, reverse, and forward-reverse proxy;

e.      Multi-protocol support for proxy integration;

f.      IP filtering capability;

g.      Dynamic Black Listing, manual or automatic responsiveness;

h.      PGP and XML encryption handling capabilities; and

i.      TCP port usage report to better understand how to configure firewalls to allow connections in or out.[16]

43.      With each of its particular managed file transfer software products, Cleo emphasized product and data security.

44.      As to Cleo Harmony, "Cleo Harmony® provides you with reliable and scalable data communications with the control, governance, and security you need for your internal and external exchanges; seamless hand-off to people, applications, and systems with high speed and ad hoc transfer; and APIs you can provision and instrument to suit your file integration processes and data movement use cases."[17] And in promoting this product, Cleo touted its credentials, noting: "Cleo is committed to providing high-quality products and services. Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[18]

45.      Similarly, as to Cleo VLTrader, Cleo noted to the world that the product would allow users to "easily migrate data into a secure file transfer solution" and "Minimize risk with tightened security and compliance."[19] And as with Cleo Harmony, Cleo touted its credentials,

---

[16] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

[17] https://support.cleo.com/hc/en-us/sections/360004927613-Cleo-Harmony

[18] https://www.cleo.com/cleo-harmony

[19] https://www.cleo.com/cleo-vltrader

again noting "Cleo is committed to providing high-quality products and services. Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[20]

46. Likewise, for Cleo LexiCom, Cleo noted that users could "[e]asily manage the movement of your valuable data," highlighting a variety of capabilities including, as is relevant here "[r]obust cloud protocols for secure data transfer," "[a]dministrative control on users and integrations," plus "SOC2 Type2, ISO-27001, CCPA & GDPR compliance."[21] And as with Cleo Harmony and VLTrader, Cleo made the same credential claim: "Cleo is committed to providing high-quality products and services. Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[22]

47. In or about April 2024, in announcing the latest release of Cleo Harmony, Cleo VLTrader, and Cleo LexiCom, Cleo explained that "[w]ith the optimal control, governance, and security you need to design, build, operate, and optimize data flows, these new releases provide a rich and robust data movement solution to power all your connections."

48. Indeed, Cleo also touted itself as "#1 Rated MFT [managed file transfer] Solution for Automating, Simplifying, and Streamlining File Transfers" and that Cleo's "MFT solutions enable you to quickly connect to internal systems and trading partner ecosystems, allowing your business to move sensitive data and govern all exchanges."[23] And it explained that "with Cleo's

---

[20] *Id.*

[21] https://www.cleo.com/cleo-lexicom

[22] *Id.*

[23] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

secure, reliable, and scalable MFT solution, you'll be able to support any secure protocol and share files with any trading partner, without the need for programming or special skills."[24]

49.     That Cleo emphasizes the importance of data security followed a number of high-profile and well-publicized data breaches involving MFT software including, but not limited to Accellion File Transfer Appliance (FTA) devices in 2020 and 2021, Fortra/Linoma GoAnywhere MFT servers in early 2023, and Progress Software's MOVEit program in May 2023.[25] Unfortunately, "[m]anaged file transfer platforms, such as Cleo Harmony, VLTrader, and LexiCom, are leveraged by organizations to securely exchange files between their business partners and customers, making it a highly desired target for threat actors."[26]

50.     Moreover, Cleo specifically pointed to data breach risk avoidance is a reason for using its managed file transfer products. As Cleo wrote in a white paper it prepared titled *Twenty Questions to Ask an MFT Vendor*: "With tabs for the average data breach toppings $3.5 million, it's critical your MFT solutions enable your data workflows to comply with government and industry regulations."[27]

51.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members Private Information, Cleo assumed the legal and equitable duties and new Moon that it was responsible for insuring the security of Plaintiff's and Class Members Private Information to protected from unauthorized disclosure and exfiltration.

---

[24] *Id.*

[25] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a

[26] https://www.cybereason.com/blog/cve-2024-55956-cleo-vulnerability

[27] https://resources.cleo.com/webinar-prepare-for-the-future-of-mft/3-20-questions-to-as?utm_source=website&utm_medium=resourcetile&utm_content=webinar&_gl=1*r6s5lh*_gcl_au*MTkwNjE4NTc4NC4xNzQ0ODIxNjIw*_ga*MTU2NDAxMTcwOS4x NzQ0ODIxNjIw*_ga_W5D3WH12BR*MTc0NDk4NTk4Ni41LjEuMTc0NDk4NzcwMy4zNS4wLjIxExN jA2NDEyNTQ

52. Plaintiff and Class Members relied on Cleo to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Cleo failed to do.

**B. The Data Breach**

53. While Cleo touts the safety and security of its products, services and systems, it failed to adhere to those promises and, instead, allowed the Data Breach to occur. Despite its emphasis on security, Cleo's software contained vulnerabilities and was hacked like other MFT software programs before it due to security vulnerabilities in Cleo's software programs.[28]

54. In October 2024, Cleo divulged a vulnerability tracked as CVE-2024-50623, that permitted unrestricted file uploads and downloads-leading to remote code execution (RCE) targeting the company's LexiCom, VLTrader, and Harmony secure file transfer products.[29]

55. Cleo did not acknowledge its exploitation "in the wild" but released an advisory to its online Solutions Center urging users to upgrade to version 5.8.0.21.[30]

56. Thereafter, in early December 2024, security researchers – not Cleo - discovered that endpoints updated with the latest security patches were still being exploited—this time via a vulnerability tracked as CVE-2024-55956.[31]

57. The vulnerability arose from improper input validation within the Autorun directory of Cleo's file transfer software. Attackers can place malicious scripts in this directory,

---

[28] https://nvd.nist.gov/vuln/detail/CVE-2024-55956

[29] https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/

[30] https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/

[31] https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/

which are then automatically executed with system privileges, leading to unauthorized command execution.[32]

58.     As a result, Cleo released a new security patch, along with an advisory urging users to update the software to version 5.8.0.24, which reportedly mitigated the threat posed by CVE-2024-55956.[2] In or about January 2025, Cleo released the "security patch (version 5.8.0.24) addresses the previously identified critical vulnerability (CVE-2024-55956)) in Cleo Harmony, VLTrader, and LexiCom that could allow an unauthenticated user to import and execute arbitrary bash or PowerShell commands on the host system by leveraging the default settings of the Autorun directory."[33]

59.     However, by this point in time Cleo's software vulnerabilities had already been exploited by December 2024 by the threat actor Cl0p.[34]

60.     Cl0p's is known for stealing data and holding it for ransom, frequently by targeting file-transfer software.[35]

61.     Attackers exploited CVE-2024-55956 by uploading specially crafted scripts to the Autorun directory of vulnerable Cleo software installations. Due to inadequate validation, these scripts were executed automatically, granting attackers the ability to run arbitrary commands without authentication.[36]

---

[32] https://truefort.com/december-2024-common-vulnerabilities/

[33] https://support.cleo.com/hc/en-us/articles/28408134019735-Cleo-Product-Security-Update-CVE-2024-55956

[34] https://www.cybereason.com/blog/cve-2024-55956-cleo-vulnerability

[35] https://www.bankinfosecurity.com/ransomware-attacks-appear-to-keep-surging-researchers-find-a-27638

[36] https://truefort.com/december-2024-common-vulnerabilities/

62.     Exploitation of common vulnerabilities like CVE-2024-55956 can lead to severe security consequences, like unauthorized access (attackers can gain control over the host system without valid credentials); privilege escalation (execution of commands with elevated privileges, compromising critical system resources); deployment of malware (potential installation of malicious software, including ransomware); lateral movement (attackers may move across the network to compromise additional systems); and service disruption (unauthorized changes can disrupt services and compromise system integrity).[37]

63.     In December 2024, Cl0p published the obfuscated names of 66 alleged victim organizations to their leak site, alongside the threat of revealing their identities on December 26 and 27, 2024, should they not comply with demands. The names of these organizations were ultimately unveiled on January 14 and 15, 2025, along with a blog post threatening to publish their data on January 18, 2025.[38]

64.     While Cleo warned CPS that student information was affected on or about February 8, 2025, CPS did not notify students or their families until March 7, 2025.

65.     On or about March 7, 2025, CPS announced that in late 2024, Cleo experienced a data security incident in which "certain student data was accessed by an unauthorized third party."[39]

66.     CPS sent Plaintiff a letter dated March 10, 2025 to notify her J.G., N.G., and Y.G.'s PII was affected by the Data Breach.

---

[37] https://truefort.com/december-2024-common-vulnerabilities/

[38]    https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/

[39] Breach Notifications, CHI. PUB. SCHS. (Mar. 7, 2025), https://www.cps.edu/about/policies/student-online-personal-protection-act/breach-notifications/ (last accessed March 12, 2025).

67.     The information accessed in the Data Breach per CPS includes names, dates of birth, gender, student ID numbers, and Medicaid ID numbers and program eligibility information, affecting approximately 700,000 students dating back to the 2017-2018 school year.

## C.     The Data Breach Was Foreseeable

68.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendant's data security system was breached, including, the significant cost that would be imposed on Plaintiff and Class Members because of a breach.

69.     Defendant was, or should have been, fully aware of the unique type and significant volume of data on their network, amounting to tens of thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

70.     As explained by the Cybersecurity and Infrastructure Security Agency (CISA), along with the Federal Bureau of Investigation (FBI), National Security Agency (NSA), and other international partners:

    a.     Cybercriminals are increasingly gaining access to networks via phishing, stolen Remote Desktop Protocols (RDP) credentials or brute force, and exploiting software vulnerabilities;

    b.     The market for ransomware became increasingly "professional" and there has been an increase in cybercriminal services-for-hire;

    c.     More and more, ransomware groups are sharing victim information with each other, including access to victims' networks;

    d.     Cybercriminal are diversifying their approaches extorting money; and

e.      Ransomware groups are having an increasing impact thanks to approaches targeting the cloud, managed service providers, industrial processes and the software supply chain.[40]

71.     However, prevention remains the most effective defense against ransom and companies can take a variety of critical precautions for protections and immediately available protections include, but are not limited to ensuring timely patching of all operating software; implementing a user training program that includes recognizing and reporting suspicious emails; securing and monitoring remote desktop protocol, if used; and maintaining an offline backup of your data. [41]

72.     In 2024 alone, cyberattacks were identified as the largest attack vector of data breaches, totaling 2,525 data breaches and approximately 1.229 billion victims.[42]

73.     In light of the recent high-profile cybersecurity incidents at other file transfer and storage companies over the last several years, including Accellion (2020-21, with software vulnerability exploited to attack around 100 organizations), Fortra (2023, with software vulnerability exploited to attack around 130 organizations), and Progress Software (2023, with software vulnerability exploited to attack around 2,500 organizations), Defendant knew or should have known that their electronic records would be targeted by cyber criminals. Moreover, these breaches of file transfer software even occurred at the hands of the same threat actor, Cl0p, putting Cleo on notice that threat actors generally – and Cl0p specifically – were specifically seeking to exploit vulnerabilities present in file transfer software.

---

[40] https://www.cisa.gov/news-events/news/cisa-fbi-nsa-and-international-partners-issue-advisory-ransomware-trends-2021

[41] *Id.*

[42] https://www.idtheftcenter.org/publication/2024-data-breach-report/

**D.    The Value of Plaintiff's PII**

74.    Individuals' PII remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[43] According to the Dark Web Price Index for 2023, credit card details for accounts with account balances up to $1,000 have an average market value of $70, while credit card details for accounts with account balances up to $5,000 have an average market value of $110.[44] Stolen payment processing accounts and/or log-ins have an average market value ranging from $10 to $4,255, while forged document scans of state driver's licenses have an average market value from $22 to $60, with USA passport scans having an average market value of $50.[45] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[46]

75.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

76.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[47]

---

[43] https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[44] https://www.privacyaffairs.com/dark-web-price-index-2023/

[45] https://www.privacyaffairs.com/dark-web-price-index-2023/

[46] https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[47] https://www.redseal.net/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers/

77.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

78.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

79.     The fraudulent activity resulting from the Data Breach may not come to light for years.

80.     Moreover, there may be a time lag between when harm occurs versus when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[48]

81.     As such, future monitoring of financial and personal records is reasonable and necessary.

**E.     Defendant Failed to Properly Protect Plaintiff's and Class Members' Private Information**

82.     Defendant could have prevented this Data Breach by properly testing, monitoring, auditing, securing and encrypting the systems containing the Private Information of Plaintiff and Class Members.

---

[48] https://www.gao.gov/assets/a262904.html

83. Defendant's negligence in not safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they maintain.

84. Despite the prevalence of public announcements of data breach and data security compromises, both generally and as to file transfer software specifically, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from compromise.

85. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[49]

86. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

87. To prevent and detect unauthorized cyberattacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures, including:[50]

      a.    Employ best practices for use of Remote Desktop Protocol (RDP) and other remote desktop services as threat actors often gain initial access to a

---

[49] https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business

[50] https://www.cisa.gov/sites/default/files/publications/CISA_Fact_Sheet-Protecting_Sensitive_and_Personal_Information_from_Ransomware-Caused_Data_Breaches-508C.pdf

network through exposed and poorly secured remote services and later propagate ransomware.

b.   Audit the network for systems using RDP, closed unused RDP ports, enforce account lockouts after a specified number of attempts, apply multi-factor authentication (MFA), and log RDP login attempts.

c.   Conduct regular vulnerability scanning to identify and address vulnerabilities, especially those on internet-facing devices, including through the use a range of no-cost cyber hygiene services, including vulnerability scanning, to help critical infrastructure organizations assess, identify, and reduce their exposure to cyber threats, such as ransomware.

d.   Update software, including operating systems, applications, and firmware, in a timely manner. Prioritize timely patching of critical vulnerabilities and vulnerabilities on internet-facing servers—as well as software processing internet data, such as web browsers, browser plugins, and document readers. If patching quickly is not feasible, implement vendor-provided mitigations.

e.   Ensure that devices are properly configured and security features are enabled, e.g., disable ports and protocols that are not being used for a business purpose.

f.   Disable or block inbound and outbound Server Message Block (SMB) Protocol and remove or disable outdated versions of SMB.

g.   Practicing good cyber hygiene practice, including by:

   i.   Ensuring antivirus and anti-malware software and signatures are up to date;

   ii.   Implementing application allowlisting;

   iii.   Ensuring user and privileged accounts are limited through account use policies, user account control, and privileged account management;

   iv.   Employing MFA for all services to the extent possible, particularly for webmail, virtual private networks (VPNs), and accounts that access critical systems; and

   v.   Implementing cybersecurity best practices from CISA's Cyber Essentials and the CISA-MS-ISAC Joint Ransomware Guide.

h.   Limiting the data by only storing personal and sensitive information needed for business operations and ensuring data is properly disposed of when no longer needed.

i.     Encrypting sensitive information at rest and in transit.

j.     Implementing firewalls to protect networks and systems from malicious or unnecessary network traffic.

k.     Applying network segmentation to further protect systems storing sensitive or personal information.

88.     To prevent and detect cyberattacks, which are common, known and preventable, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures, which are known in the industry to build better security posture and enable entities to be more resistant to cyberattacks in general:[51]

---

[51] https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/



89.    Moreover, given that Defendant was maintaining the PII of Plaintiff and Class Members, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

90.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

91.    Because Defendant failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized criminal third party was able to access Defendant's network, and access Defendant's database and system configuration files and exfiltrate that data.

**F.       Defendant Failed to Comply with FTC Guidelines**

92.       The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

93.       In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[52]

94.       The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

95.       The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

96.       Defendant failed to properly implement basic data security practices.

---

[52] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016).

97.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

98.     Defendant was always fully aware of its obligation to protect the Private Information of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**G.     Defendant Failed to Comply With Industry Standards for Data Security**

99.     In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, and Capital One, as well as breaches specifically involving file transfer software (Acellion, Fortra, Progress), Defendant was, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of their systems being breached.

100.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

       a.     Maintaining a secure firewall configuration;

       b.     Monitoring for suspicious or irregular traffic to servers;

       c.     Monitoring for suspicious credentials used to access servers;

       d.     Monitoring for suspicious or irregular activity by known users;

       e.     Monitoring for suspicious or unknown users;

       f.     Monitoring for suspicious or irregular server requests;

       g.     Monitoring for server requests for PII;

       h.     Monitoring for server requests from VPNs; and

       i.     Monitoring for server requests from Tor exit nodes.

101.    The FTC publishes guides for businesses for cybersecurity[53] and protection of PII[54]

which includes basic security standards applicable to all types of businesses.

102.    The FTC recommends that businesses:

a.    Identify all connections to the computers where you store sensitive information.

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from

---

[53] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

[54] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

103. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[55]

104. Because Defendant was entrusted with PII, it had, and has, a duty to keep the PII secure.

105. Plaintiff and Class Members reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

106. Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

107. Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and

---

[55] https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement

routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

108.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

109.    The foregoing frameworks are existing and applicable industry standards in the software and data management/transfer industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

110.    Upon information and belief, Defendant failed to comply with one or more of the foregoing industry standards.

**H.    The Effects of the Data Breach**

111.    The effects of the Data Breach are devastating.

112.    Due to the sensitive nature of the information moved using the Cleo products, the Plaintiff and Class Members have suffered significant exposure and are now at an elevated risk for identity theft and fraud, while many have already experienced significant fraud, identity theft, and other related issues.

113.    The kinds of information exposed in the Data Breach provide hackers and cybercriminals a wealth of opportunities for committing additional crimes and harming Plaintiff and Class Members even further.

114.    Fraud and identity theft will continue to happen, through the buying, selling, ransoming, and continued exploitation of the personal information, financial information, and other sensitive information exposed in this far-reaching Data Breach.

115.    Cybercriminals can and do use the Private Information that Defendant was entrusted to safeguard to perpetrate financial crimes that harm Plaintiff and the Class Members.

116.    As the United States Court of Appeals for the Seventh Circuit aptly observed almost a decade ago: "the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

117.    This remains true, ten years later. The intent of hackers (such as CL0P) is clear when they hack systems, such as the Defendant's: they are attempting to access consumers' Private Information for the purpose of ransoming it back, and/or selling it for a profit.

118.    There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average, it takes approximately three months for a consumer to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.

119.    In addition, there is a strong probability that much of the information stolen in the Data Breach has not yet been made available on the black market in a coherent, organized fashion,[56] meaning Plaintiff and Class Members will remain at an increased risk of fraud and identity theft for many years into the future. Thus, as the Data Breach Notices advise, customers,

---

[56]    https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/

including Plaintiff and Class Members, must vigilantly monitor their financial accounts for many years to come.

120.    In addition to all the other immediate consequences of the Data Breach, Plaintiff and Class Members face a substantially increased risk of identity theft and fraud.

121.    The Federal Trade Commission recommends that identity theft victims take several steps to protect their Private Information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[57]

122.    Cybercriminals use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Class Action Allegations.

123.    Victims of identity theft face a variety of consequences, including various lost time including, loss of time resolving financial or credit problems associated with an identity theft, time reporting the incident to law enforcement, and loss of time spent interacting with credit card organizations.[58]

---

[57] https://www.identitytheft.gov/Steps

[58] https://bjs.ojp.gov/press-release/victims-identity-theft-2021#:~:text=Victims%20of%20new%20account%20misuse,a%20result%20of%20the%20crime.%E2%80%9D

124.     On average, victims sustain direct financial losses of $880, while victims of new

account misuse ($3,430) have higher direct losses on average compared to victims of bank account

($670) and credit card misuse ($620).[59]

## V.     CLASS ACTION ALLEGATIONS

125.     Plaintiff brings this nationwide class action on behalf of her minor children J.G.,

N.G., and Y.G. and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and

23(c)(4) of the Federal Rules of Civil Procedure.

126.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All persons whose Private Information was accessed or acquired
> during the Data Breach as a result of the exploitation of Cleo
> Communications' software vulnerability (the "Class").

127.     Excluded from any Class or Subclass are the following individuals and/or entities:

Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity

in which Defendant has a controlling interest; all individuals who make a timely election to be

excluded from this proceeding using the correct protocol for opting out; any and all federal, state

or local governments, including but not limited to their departments, agencies, divisions, bureaus,

boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect

of this litigation, as well as their immediate family members.

128.     Plaintiff reserves the right to modify or amend the definition of the proposed class

before the Court determines whether certification is appropriate.

129.     <u>Numerosity, Fed. R. Civ. P. 23(a)(1)</u>: Class Members are so numerous that joinder

of all members is impracticable. Upon information and belief, there are tens of thousands of

---

[59] https://bjs.ojp.gov/press-release/victims-identity-theft-2021#:~:text=Victims
%20of%20new%20account%20misuse,a%20result%20of%20the%20crime.%E2%80%9D

individuals whose Private Information may have been improperly accessed in the Data Breach, and the Class is readily identifiable within Defendant's records.

130. <u>Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3)</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendant had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e.   Whether Defendant failed to properly review, assess, and manage the cybersecurity risk posed by third party vendors and service providers;

f.   Whether and when Defendant actually learned of the Data Breach;

g.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

i.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

j.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

k.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

l.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

    m.    Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

    n.    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

131.    <u>Typicality, Fed. R. Civ. P. 23(a)(3)</u>: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

132.    <u>Adequacy of Representation, Fed. R. Civ. P. 23(a)(4)</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

133.    <u>Predominance, Fed. R. Civ. P. 23(b)(3)</u>: Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was maintained and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

134.    <u>Superiority, Fed. R. Civ. P. 23(b)(3)</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

135.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

136.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, including their privacy policies, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

137. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

138. Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Petition.

139. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

140. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their Private Information;

    b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their Private Information;

    c.    Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

    e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f. Whether Defendant's data security practices related to its Cleo Communications software prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security practices related to its Cleo Communications software prior to and during the Data Breach were consistent with industry standards;

h. Whether hackers obtained Class Members' Private Information via the Data Breach;

i. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members; and

j. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## VI. CLAIMS FOR RELIEF

### COUNT 1

### NEGLIGENCE

141. Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

142. Entities using Cleo's software require their customers to submit nonpublic Private Information as a condition of becoming a customer and receiving services.

143. Through its relationships with these entities, Cleo facilitated the transfer and storage of the Private Information of Plaintiff and Class Members as part of its business, which affects commerce.

144. As customers of entities using Cleo's software, Plaintiff and Class Members, or their service providers, continue to send these entities new Private Information as they continue to receive services or conduct business with these entities.

145. Plaintiff and Class Members entrusted entities using Cleo's software with their Private Information with the reasonable understanding that their highly personal Private Information would be safeguarded and protected against unauthorized disclosure.

146. Cleo had full knowledge of the high monetary value and sensitivity of Plaintiff's and Class Members' Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information was wrongfully disclosed.

147. By assuming the responsibility to facilitate the transfer and storage of this data through its software, in order to derive business value and commercial profits, Cleo assumed a duty under common law to Plaintiff and Class Members to exercise reasonable care to ensure that its software would be secure and safeguard their Private Information and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

148. Cleo owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, as well as its software, and the personnel responsible for them, adequately protected the Private Information.

149. Cleo's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

150. Cleo holds itself out as a trusted provider of secure file-transfer software. Its duty to develop software that included reasonable security measures arose as a result of the special relationship that existed between Cleo, on the one hand, and Plaintiff and Class Members, through their relationship with users of the software, on the other hand. That special relationship arose because of Cleo's business as the developer of file transfer software, which required Plaintiff and

Class Members to provide and entrust users of the software with their confidential Private Information, who in turn relied on Cleo's software to transfer and store that data securely.

151.    Thus, Cleo was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

152.    Cleo owed a duty to Plaintiff and Class Members to develop and maintain a software file transfer service that employed reasonable data security measures to protect the Private Information its customers collected, stored, and used on its software.

153.    The risk that unauthorized persons would attempt to gain access to Plaintiff's and Class Members' Private Information and misuse was foreseeable to Cleo.

154.    It had a common law duty to prevent foreseeable harm to others because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Cleo. By selling software whose function is collecting, receiving, storing, and using Private Information that is routinely targeted by criminals for unauthorized access, Cleo was obligated to act with reasonable care to protect against these foreseeable threats.

155.    Given that Cleo's software enables Cleo's customers to collect, store, and use vast amounts of Private Information and the high market value of this data, it was inevitable that unauthorized cybercriminals would at some point try to hack into the software or Cleo's computer networks. Cleo knew, or should have known, the importance of exercising reasonable care in developing, monitoring, managing, and updating its software.

156.    Cleo had a duty to promptly and adequately notify Plaintiff and Class Members about the Data Breach, but failed to do so, and breached this duty.

157.    Cleo had and continues to have duties to adequately disclose that Plaintiff's and Class Members' Private Information might have been compromised, how it was compromised,

and precisely the types of data that were compromised and when. Such notice was and continues to be necessary to allow Plaintiff and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

158. Cleo breached its duties owed to Plaintiff and Class Members and thus was negligent. Cleo breached these duties by, among other things: (a) mismanaging its software development and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of its transfer software, which resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to detect the breach at the time it began or within a reasonable time thereafter; and (f) failing to follow its own policies and practices published to its clients.

159. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach and harms suffered.

160. Cleo's negligent conduct is ongoing, in that Plaintiff's and Class Members' Private Information remains stored on Cleo's software in an unsafe and insecure manner.

161. Plaintiff and Class Members are entitled to injunctive relief requiring Cleo to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT 2

## NEGLIGENCE PER SE

162.    Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

163.    Pursuant to Federal Trade Commission, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

164.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

165.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

166.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

167.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

168.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of

identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued risk to their Private Information, which remains in Defendant's control, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

169. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

170. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT 3

## UNJUST ENRICHMENT

171. Plaintiff and Class Members bring this claim in the alternative to the other claims asserted in this action.

172. Plaintiff and Class Members conferred a monetary benefit on the Defendant in connection with obtaining services, specifically providing them with their Private Information. In exchange, Plaintiff and Class Members should have received the services or benefits that were the subject of the transaction, and should have had their Private Information protected with adequate data security.

173. Plaintiff and Class Members also conferred a monetary benefit indirectly to Cleo via Cleo's relationship with users of Cleo's software. Cleo would be unable to engage in its regular

course of business without that Private Information, and it accepted the monetary benefits from the provision of Plaintiff's and Class Members' Private Information.

174.    Cleo knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained those benefits by allowing users of Cleo software to accept, retain, and use the Private Information entrusted to them through the Cleo software.

175.    Acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Cleo to retain that benefit without payment of the value thereof. Specifically, Cleo enriched itself by saving the costs it reasonably should have expended on data security measures to secure its Cleo software and thereby secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Cleo instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Cleo's decisions to prioritize its own profit over the requisite data security.

176.    Cleo failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff and Class Members for the value that their Private Information provided.

177.    Because Cleo failed to implement appropriate data management and security measures, under the principles of equity and good conscience, it would be unjust if Cleo were permitted to retain the monetary benefit belonging to Plaintiff and Class Members.

178.    If Plaintiff and Class Members had known that Cleo had not secured the Cleo software responsible for transferring or storing their Private Information, they would not have

agreed to provide their Private Information to the direct users or vendors who utilized Cleo software.

179. Had Plaintiff and Class Members known that Cleo did not and would not use adequate data security practices, procedures, and protocols to adequately secure their Private Information, they would not have entrusted their Private Information to the direct users or vendors who utilized Cleo software.

180. As a direct and proximate result of Cleo's conduct, Plaintiff and Class Members have suffered or will suffer injury, including, but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to determine for themselves how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information and diminution of its value; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains on Cleo's software and is subject to further unauthorized disclosures so long as Cleo fails to undertake appropriate and adequate measures to protect Private Information kept on Cleo software; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; (viii) emotional distress, anxiety, and inconvenience; (ix) irreparable breach of confidence in their insurance providers; and (x) loss of benefit of the bargain.

181.     As a direct and proximate result of Cleo's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm. It would be inequitable for Cleo to retain the benefits without paying fair value for them.

182.     Plaintiff and Class Members are entitled to restitution and/or damages from Cleo and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Cleo from its wrongful conduct, as well as return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

183.     Plaintiff and Class Members may not have an adequate remedy at law against Cleo, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT 4

## DECLARATORY JUDGMENT

184.     Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

185.     Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

186.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

187.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendant is currently

maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

188.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect Plaintiff's and Class Members' Private Information.

189.    Defendant still controls the Private Information of Plaintiff and the Class Members.

190.    To Plaintiff's knowledge, Defendant has made no announcement that it has changed their data or security practices relating to the Private Information.

191.    To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

192.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach. The risk of another such breach is real, immediate, and substantial.

193.    As described above, actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

194.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

195.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs, Plaintiff and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

196.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the additional injuries that would result to Plaintiff and Class.

197.    Plaintiff and Class Members seek a declaration (i) that Defendant's existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security; and (ii) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a.    engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and promptly correct any problems or issues detected by such third-party security auditors;

b.    engage third-party security auditors and internal personnel to run automated security monitoring;

c.    audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

d.    purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for their provision of services;

e.    conduct regular database scanning and security checks; and

f.    routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, PII.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Aurora Carrillo, on behalf of her minor children J.G., N.G., and Y.G., on behalf of all Class Members, respectfully request that the Court enter judgment in her favor and against Defendant, as follows:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

B.    A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other relief as justice requires;

C.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

1.    Ordering Defendant engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and promptly correct any problems or issues detected by such third-party security auditors;

2.    Ordering Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

3.    Ordering Defendant audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

4.  Ordering Defendant purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for their provision of services;

5.  Ordering Defendant conduct regular database scanning and security checks; and

6.  Ordering Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, PII.

D.  A judgment in favor of Plaintiff and the Class awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

E.  Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial for all claims so triable.

Dated: May 20, 2025                Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Daniel J. Kurowski*
Daniel J. Kurowski
Whitney K. Siehl
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
(708) 628-4949
dank@hbsslaw.com
whitneys@hbsslaw.com

*Attorneys for Plaintiff and the Proposed Class*